## STATE vs. REESE ROBERTS.

1. GRAND JURY—MOTION FOR LEAVE TO SHOW THAT INDICTMENT WAS FOUND ON ILLEGAL TESTIMONY—CONSTITUTIONAL PROVISIONS.

*Const. art.* 1, § 7, giving to accused the right to be heard by himself and his counsel, and to meet the witnesses face to face, does not justify the court to grant a motion to permit accused to show that the indictment against him was found by the grand jury on illegal testimony, where the affidavit in support of the motion is based on belief, without averring any corruption on the part of the grand jury.

2. JURY—QUALIFICATIONS—EXAMINATION.

Under the statute declaring what questions may be put to a juror on his *voir dire* in a capital case, a question as to whether the juror has any objection to returning a verdict of guilty on circumstantial evidence, where the punishment is death, is properly excluded.

3. CRIMINAL LAW—DEFENSE—"ALIBI."

The defense of "*alibi*" means that accused was not at the scene of the crime at the time of its commission, but was at that time elsewhere.

4. HOMICIDE—"FELONIOUS HOMICIDE."

"Felonious homicide" is either murder in the first or second degrees or manslaughter.

5. HOMICIDE—ELEMENTS—"MALICE."

"Malice," as an essential ingredient of murder in the first and second degrees, is not restricted to spite or malevolence toward the person killed, but includes that general malignity and reckless disregard of human life which proceed from a heart void of a just sense of social duty and fatally bent on mischief.

6. HOMICIDE—MALICE—BURDEN OF PROOF.

Where a killing is done deliberately, or without adequate cause, the law presumes that it was done with malice; and the burden is on accused to show that the act was not so done.

7. HOMICIDE—"MURDER OF THE FIRST DEGREE."

"Murder of the first degree," is the killing with express malice aforethought, or in perpetrating or attempting to perpetrate a crime punishable with death.

8. HOMICIDE—MURDER IN THE FIRST DEGREE—"EXPRESS MALICE AFORETHOUGHT."

"Express malice aforethought," essential to murder in the first degree, occurs where one person kills another with a sedate, deliberate mind and formed design; and the length of time that the design existed is immaterial.

9. HOMICIDE—MURDER OF THE FIRST DEGREE—EXPRESS MALICE AFORETHOUGHT—EVIDENCE.

Express malice aforethought essential to constitute murder of the first degree, may be proved by any circumstances evincing a sedate, deliberate mind and formed design to kill, and may be shown from the circumstances attending the act, such as the deliberate selection and use of a deadly weapon.

10. HOMICIDE—"MURDER OF THE SECOND DEGREE."

"Murder of the second degree" is the killing with implied malice, in-

ferred from the facts proved, where there is no deliberate mind or formed design to take life, but where the killing is done without justification or excuse, and without provocation sufficient to reduce the offense to manslaughter.

11. HOMICIDE—MURDER OF THE SECOND DEGREE—MALICE.

Malice, essential to murder of the second degree, is implied by law from every unlawful and cruel act committed by one person against another, so that, where the killing is done with a deadly weapon likely to produce death, it is presumed to have been done maliciously.

12. HOMICIDE—"MANSLAUGHTER."

"Manslaughter" occurs where one person unlawfully kills another without malice, as where one in a sudden affray, in the heat of blood, or in a transport of passion, inflicts a mortal wound, without time for reflection or for the passions to cool.

13. CRIMINAL LAW—EVIDENCE—CIRCUMSTANTIAL EVIDENCE.

Circumstantial evidence is receivable in criminal cases.

14. CRIMINAL LAW—"CIRCUMSTANTIAL EVIDENCE."

"Circumstantial evidence" is where, some facts being proved, another fact follows as a natural conclusion from the facts actually proved, and it is the inference of a fact from other facts proved, and the fact thus inferred and assented to by the mind is taken for granted until the contrary is proved; but, to justify a conviction on circumstantial evidence, the evidence must be satisfactory, and of such significance and force as to produce conviction in the minds of the jury of the guilt of accused beyond a reasonable doubt.

15. CRIMINAL LAW—TRIAL—QUESTION FOR JURY.

Where the evidence is conflicting, the jury must reconcile it, if they can; and, if they cannot, they must accept the part of it which they deem worthy of credit.

16. CRIMINAL LAW—TRIAL—STATEMENT OF ACCUSED—CREDIBILITY.

The jury, in determining the credit to be given to a statement in writing made by accused, must consider the whole statement; but they may reject such parts of it as are contradictory to other parts, or in conflict with facts otherwise proved, and they may believe the part which charges accused, and reject that which is in his favor.

17. CRIMINAL LAW—PRESUMPTION OF INNOCENCE.

Accused is presumed to be innocent until his guilt is proved beyond a reasonable doubt; and the state, to justify a conviction, must prove beyond such a doubt every material element of the crime.

18. CRIMINAL LAW—"REASONABLE DOUBT."

Proof beyond a reasonable doubt does not mean that the guilt of accused must be established with the absolute certainty of a mathematical demonstration, and it is sufficient that any disputed fact is established by that amount of competent evidence which will satisfy a fair and unprejudiced mind beyond a reasonable doubt; and the term does not mean a vague, speculative, or whimsical doubt, or a mere possible doubt, but a substantial doubt.

19. HOMICIDE—MURDER OF THE FIRST DEGREE—EVIDENCE.

Evidence *held* to justify a conviction of murder of the first degree.

20.  CRIMINAL  LAW—EVIDENCE—ADMISSIBILITY.

Where, on a trial for murder, there was evidence that money of decedent was missing, and that a combination lock of the safe in the store on the first floor of the residence of accused had been knocked off, evidence, in rebuttal to the testimony of accused, that for several days prior to the murder he had not been working and had no money, and that following the murder he exhibited a roll of bank notes, was properly received.

21.  CONSTITUTIONAL  LAW—DUE  PROCESS  OF  LAW—CRIMINAL  PROSECU-
TIONS.

The failure of a coroner to hold an inquest over the body of decedent at the request of the Attorney General does not deprive accused of the rights granted by *Const. art.* 1, § 7, giving to accused the right to be informed of the nature and the cause of the accusation against him and to have compulsory process for witnesses in his favor.

(*October* 3, 1910.)

PENNEWILL, C. J., and BOYCE and CONRAD, J. J., sitting.

*Andrew C. Gray*, Attorney General, and *Josiah O. Wolcott*, Deputy Attorney General, for the state.

*J. Frank Ball* for the prisoner.

At a Court of Oyer and Terminer in and for New Castle County, on October third, 1910, the prisoner having been indicted upon two indictments for the murder of Ann M. Casey and Robert Casey, Jr., respectively, pleas of not guilty were entered, and on motion of his counsel, leave was granted the prisoner to withdraw his pleas, in order to make the motions as set out in the following opinion of the court.

Verdict of guilty, and writ of error sued out of Supreme Court by defendant.

(See report of case in Supreme Court, *post* 385.)

PENNEWILL, C. J., delivering the opinion of the court:

The court have carefully considered these motions, having given them considerable thought since the argument, and we are now prepared to render our decision.  The motions, as we understand them, are that Reese Roberts, who has been indicted at the present term of this court, for the murder of Ann M. Casey and Robert Casey, Jr., of Brandywine Hundred, shall be permitted to offer testimony to show that the indictments against him were found upon illegal and improper testimony.

In support of these motions, affidavits have been filed which

aver "that the grand jury which found each of said indictments received incompetent, illegal, irrelevant, hearsay and secondary evidence in order to receive any testimony which would authorize them to return said indictments into this court; and that, without said illegal, incompetent, irrelevant, hearsay and secondary evidence, there was no testimony introduced whatever before said grand jury which proved or tended to prove in any manner the charge set out in said indictments."

The defendant further avers in each of his affidavits that it is made in good faith and that he believes that the only testimony before the grand jury was hearsay testimony alone.

Upon each of said affidavits he prays for an order to examine witnesses to substantiate his statements and that each of said indictments shall be quashed and set aside.

It will be noted that there is no affidavit filed by any one who knows or professes to know the fact that the indictments were found upon said testimony; and it will be further observed that there is no averment in either of these affidavits of any fraud or corruption on the part of the grand jury.

But one authority has been cited in support of the prisoner's application and that is the case of *Royce v. Territory of Oklahoma,* 5 *Okl.* 61, 47 *Pac.* 1083. And while that case does seem to support the contention made by counsel for the defendant, yet upon a careful reading it will be found that the decision in that case was based very largely upon a statute of the territory of Oklahoma; and we have not been informed that there is any similar statute in any other state, and certainly there is no such statute in this state. It is true we have in this state the following constitutional provision: "In all criminal prosecutions, the accused hath a right to be heard by himself and his counsel, to be plainly and fully informed of the nature and cause of the accusation against him, to meet the witnesses in their examination face to face, to have compulsory process in due time, on application by himself, his friends or counsel, for obtaining witnesses in his favor, and a speedy and public trial by an impartial jury; he shall not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the

law of the land." (*Const. Del. art.* 1, § 7.) But we think there is nothing in this provision of the Constitution which would justify this court in granting the application made by the prisoner. We think that there cannot be found in any state, perhaps, where the rules of the common law govern, any case which would justify the court in granting this application; and we do not think upon the authority of the Oklahoma case alone that we should reverse what has been, as far as we know, the universally recognized doctrine or rule, for many, many years in this state in regard to indictments and the evidence upon which the grand jury find them; there being no allegations or averments of fraud or corruption on the part of the grand jury.

The motions are refused.

On October 10, 1910, the prisoner, a colored man, was placed on trial for the murder of Robert Casey, Jr., on the nineteenth of August, 1910, in Brandywine hundred, New Castle county.

The contention of the state was that the prisoner, on the night of August nineteenth, went to the home of Robert Casey, Jr., on the Philadelphia pike, near Claymont, and by striking and beating him, while in bed, with a club broken from a wild cherry tree standing upon the bank of the Delaware river, killed and murdered the said deceased with express malice aforethought; and that the prisoner was therefore guilty of murder of the first degree.

The evidence of the state was wholly circumstantial. It was substantially as follows:

Robert Casey, Jr., was last seen alive about six o'clock on the evening of August nineteenth, 1910. The next norning, about half-past six o'clock two drivers of a bakery wagon stopped at Casey's store and dwelling to deliver bread. Not finding Casey and his wife up, they called "Uncle Bob" about a dozen times and also made noises by dropping boxes upon the front porch floor in order to arouse them. Not succeeding in doing so, one of them then entered the house through a rear side window, the shutter of which was slightly ajar, and proceeding to the second story, discovered both Robert Casey, Jr., and his wife, Ann Casey, lying

dead in bed in a room at the front part of the house facing the
Philadelphia pike.    The left side of each of their faces was bruised,
their skulls were crushed in over the temple, as if they had been
struck by some blunt instrument, and blood had oozed from their
noses, ears and mouths.    Leaning against a screen, which was lean-
ing against the window of the same bedroom, was found a club,
about three feet long, evidently broken or twisted from a wild
cherry tree.    The club was about an inch and three-quarters
thick at  the larger end and one inch thick at the small end.    It
had blood spots upon it.    The physician who made the autopsy
testified that death was caused by the above-described wounds
and that the same were evidently produced by the said club or
some similar instrument.    A ladder was found lying upon the
ground not far from the house.    It was long enough to reach
the roof of the front porch.    Upon this roof the window of the
bedroom, where the two bodies were found, opened.    This porch,
as well as the rear shed, had a tin roof.    Tracks of dust and scratch-
es were found upon the former roof and tracks of dust also upon
the latter.    Crushed egg shells were found upon the chair near
the window, the shutter of which was ajar on the first floor.    Egg
stains were upon the sill of the same window, and also upon the
cellar door beneath it on the outside, where they had evidently
been tracked.    There were no other tracks around the house.
The combination lock of the safe, in the store on the first floor,
had been knocked off.    A hatchet and shutter bolt were found
near the safe.    A quantity of pennies and dimes contained in
separate spool boxes were found concealed behind certain ledgers
in the safe which seemed not to have been disturbed.    Detective
Gillis the morning after the murder found on the floor of the safe,
in plain view, a red leather wallet containing silver coins of var-
ious denominations from fifty cents down amounting in all to
about thirty-eight dollars and ten cents, also some old and foreign
coins in the same wallet.    A black leather wallet which the de-
ceased was familiarly known to have kept in the safe, and in which
he kept his money before depositing in bank, was missing.

There was also found in the bedroom, where the bodies of the
Caseys were discovered, two or three dollars in the pockets of the

trousers of Robert Casey, Jr., said trousers being hung across the back of a chair; also three watches and brooches were found in same room.

Three witnesses testified that between five and six o'clock on the night of the murder they saw the prisoner walking on Darley road just west of the Philadelphia pike, being 3,200 feet south of the Casey home. Two other witnesses, being the conductor and motorman, respectively, of a Darby trolley car, testified that they saw the prisoner get on their car at Eighth and Market streets, Wilmington, between 8:38 and 8:40 of the same night, and that he got off the car between 9:15 and 9:20 at Myrtle avenue, just opposite the Darley road where the three witnesses located him earlier in the evening; Myrtle avenue being a road leading from the Philadelphia pike to the Delaware river. Mrs. Baldwin, another witness, saw the prisoner at 10:55 the same night east of the railroad station at Claymont, about three-quarters of a mile from the Casey home, where he stopped at the window of her residence, saying that he had gotten off the train at the wrong station and asking if she could direct him to a place where he could stay all night. She could not give him the information, and he left. She positively identified the prisoner as the man she saw, stating that an electric light was shining from the ceiling of the room down into his face as he stood outside near the window, which was up and had a screen in it, and that it was a bright moon-light night.

On August twenty-fifth, the wild cherry tree, from which the club was taken with which the murder was supposed to have been committed, was found on the bank of the Delaware river, 2,500 feet southeast of the Casey home. The butt of the cherry tree from which the club was taken was offered in evidence, as well as the piece broken from the small end of the club. Both fitted to a nicety the respective ends of the club from which they had been detached. A long bark-covered splinter left on the butt fitted exactly into a corresponding splintered place on the large end of the club.

On the same day certain tracks were discovered leading from Myrtle avenue in an easterly direction along the Delaware river,

first across a corn field to a grass field, where they disappeared, then continuing across a plowed field made ready for sowing grass, then continuing across another corn field to a point within four to six feet of the wild cherry tree, at which point, owing to the ground being packed, the tracks were not visible. About the same distance from the wild cherry tree the tracks again started in a northwesterly direction through the same corn field, and upon reaching the northwesterly side thereof, turned in a southwesterly direction and ended at the corner of the corn field. The last track seen at that point pointed in the direction of the Casey home. From this point a cart track ran in a northwesterly direction to the fence, separating an adjoining grass field from the right of way of the Philadelphia, Baltimore & Washington Railroad. On this fence about opposite the cart track were muddy prints. This was 1,600 feet from the Casey home, to which point the ground was grass sod. Similar tracks were observed starting near the place where they disappeared at the northwest corner of the corn field and proceeding toward the Delaware river, south of the first-mentioned tracks, but nearly parallel with the same, back to the wild cherry tree, thence from the wild cherry tree, parallel with the Delaware river, back to Myrtle avenue, appearing where-ever the tracks in the opposite direction appeared. In some places these tracks overlapped those going in the opposite direction. Between the grass field and the plowed field above referred to, there was a branch or run emptying into the Delaware river. A short distance east of this, on the bank of the river, there was a board sign, and near the latter point were two deep impressions of footprints as if some one had jumped from the plowed field along the river down on the sand of the river shore. The sand had partly filled these tracks and their characteristics could not be determined. The ground, especially in the corn field where the wild cherry tree stood, had been recently cultivated in the direction in which the tracks were made, toward the northwest. At the time the tracks were made, the ground, being a clay loam, had been rendered by recent rain somewhat of the consistency of putty, so that the footprints were clearly molded in the earth, and the ground subsequently drying out (there being no rain between

Facts.

the time of the murder and the discovery of the tracks) had left the tracks clearly outlined.

As one witness put it, they were similar to butter prints. Said tracks disclosed the following characteristics: The tracks made by both the right and the left shoe each showed in the bottom of the same the print of a half sole, as well as the print of the nails across the lower part of the half sole, and on the right side of the right track, at the corner of the impression of the half sole about the center of the track, there was the imprint of a group of three nail heads which were more prominent than the others. There was also shown an impression of cleats on the outside edge of each heel. The impressions of two slits on the right and left sides of the uppers of both the right and the left shoes, at the wide part of the shoe near the sole, were disclosed in the tracks. The slits on both sides did not appear in the same track, but said slits were disclosed by examining a number of tracks, in some of which they showed on one side and in others on the other side, depending upon whether the track was made against one side of the furrow or the other.

A few days after the discovery of the wild cherry tree, and of the tracks, the shoes of the prisoner were obtained from him at his home in Chester, Pennsylvania. An examination of them disclosed that the shoes each had half soles secured with nails. They had iron cleats on the outside edge of each heel. Two slits were cut in the sides of both shoes. Upon a comparison of the shoes with the said tracks, they were found to exactly correspond; not only as to size, but also as to all the above-named characteristics or peculiarities, including the group of three prominent nail heads at the corner of the half sole of the right shoe, above referred to. The prisoner stated that he had purchased the shoes in Indiana some time prior to the murder and that they had never since been out of his possession.

It was shown that the prisoner was familiar with the neighborhood where the murder was committed and knew the murdered people. It was also shown by the witness Edward Stevenson (in rebuttal to the prisoner's testimony, that for several days prior to the murder he had not been working and had no money)

that the morning following the murder the prisoner exhibited a roll of bank notes to said witness who was working in a field near Brandywine Springs, telling the latter to stop work and accompany him to a brewery and that he would pay him for his day's work. It was also shown that the prisoner had previously pleaded guilty to a charge of burglary.

The defense was an *alibi* and a general denial of the charge. The prisoner positively contradicted the testimony of the six witnesses for the state who swore that they saw him during the afternoon or evening preceding the murder, in the neighborhood of the Philadelphia pike and Darley road, or Myrtle avenue. He stated that he was in the neighborhood the day before the murder, but had not been east of the Philadelphia pike since July fourth.

During the impaneling of the jury, Attorney General Gray, asked one of the jurors, upon his *voir dire*, the following question as a ground for challenge for cause: "Have you any objection to returning a verdict of guilty, in a case where the punishment is death, if the evidence should so warrant, the evidence being circumstantial?"

*Mr. Ball*, for the prisoner, objected.

PENNEWILL, C. J.:—A very old statute of this state provides, that certain questions may be propounded to a juror upon his *voir dire* before he is sworn in a capital case. We do not think it has been attempted until now to introduce a new question or broaden the scope of any that the law allows. We are clearly of the opinion that we should adhere to the practice and procedure in this regard that has prevailed for so many years, and permit only such questions to be asked the juror as the statute authorizes, and in the language of the statute. It is becoming more difficult all the time to select a jury in a capital case, and the difficulty would certainly be increased if we should relax the rule that has hitherto prevailed.

The question is disallowed.

PENNEWILL, C. J., charging the jury:

Gentlemen of the jury:—Reese Roberts, the prisoner at the bar, is indicted for the murder of Robert Casey, Jr., on the nine-

teenth day of August of the present year in Brandywine Hundred in this county.

It is charged in the indictment that the prisoner on said day feloniously, wilfully and with express malice aforethought made an assault upon the said Robert Casey, Jr., with a blunt instrument commonly called a club, and by striking and beating the deceased upon the left side of the face and head gave unto him divers mortal wounds of which he the said Robert Casey, Jr., died.

The state contends that the prisoner on the night of the nineteenth day of August went to the home of Robert Casey, Jr., situated on the Philadelphia turnpike, and near the town of Claymont, and by striking and beating him, while in bed, with a limb or stick broken or wrenched from a wild cherry tree standing upon the bank of the Delaware river, killed and murdered the said Robert Casey, Jr., with express malice aforethought, and that the prisoner is, therefore, guilty of murder of the first degree.

The prisoner denies that he committed the crime charged against him, or that he had anything to do with the killing to the deceased.   He claims that he was not at the home of Robert Casey, Jr., on the night of the nineteenth of August, and could not have committed the offense for which he stands indicted, or any other offense at the time and place stated.

This defense is, therefore, what is termed an *alibi;* which means that the accused was elsewhere at the time, and not at the scene of the crime when it was committed.

The prisoner being indicted for murder of the first degree, it becomes the duty of the court to state to you, as clearly as we are able to do, what constitutes that degree of murder, and we feel it incumbent upon us to tell you also what constitutes murder of the second degree, and manslaughter, because a statute of this state provides that: "A person indicted for murder may be found guilty of either degree of murder, or of manslaughter."

Homicide, we may say, is the killing of one human being by another.   Felonious homicide is of three kinds: Murder of the first degree, murder of the second degree and manslaughter.   Malice is an essential ingredient of the crime of murder of both degrees. Without malice there can be no murder either of the first or of

the second degree. Malice is a condition of the mind or heart. As here used this term is not restricted to spite or malevolence toward the particular person slain, but also includes that general malignity and reckless disregard of human life which proceed from a heart void of a just sense of social duty and fatally bent on mischief. Whenever the fatal act is done deliberately or without adequate cause, the law presumes that it was done with malice, and the burden is on the prisoner to show from the evidence, or by inference from the circumstances of the case, that the act was not done with malice.

Murder of the first degree is where the killing was done with express malice aforethought, or in perpetrating, or attempting to perpetrate a crime punishable with death. Express malice aforethought is where one person kills another with a sedate deliberate mind and formed design, which formed design, or purpose, may be shown from the circumstances attending the act, such as the deliberate selection and use of a deadly weapon, knowing it to be such, stealthily lying in wait, preconcerted plans, or the previous procurement or preparation of instruments, contrivances or other means for slaying the victim. These, however, are but some of the instances, given for the sake of illustration, in which the external or attending circumstances will evidence the sedate, deliberate mind and formed design to kill, for whenever in any other instance the attending circumstances evidence such a mind and design to do the act, and death ensues, it constitutes, in law, express malice aforethought, and murder of the first degree, under the statute, and is punishable with death as where one either from motives of hatred or revenge, or with a view to rob him of his money or get possession of any other thing about his person or dwelling, coolly and deliberately forms the design in his mind to kill another, and commits the act, either by lying in wait for him, or in any other manner,—it is murder with express malice aforethought, and of the first degree. If the jury are satisfied from the evidence that the prisoner killed the deceased with a sedate, deliberate and formed design and intention so to do, the length of time that such design or intention existed is immaterial and the

killing under such circumstances would be murder of the first degree.

Murder of the second degree is where the killing was done with implied malice; that is, where the malice is not express, as in murder of the first degree, but is an inference or conclusion of law from the facts actually proved. It is where there is no deliberate mind or formed design to take life, but where the killing was done without justification or excuse and without provocation, or without sufficient provocation to reduce the offense to manslaughter. For example, where the killing was done without design and premeditation, but under the influence of a wicked and depraved heart, or with a cruel and reckless disregard of human life, the law implies malice and makes the offense murder of the second degree.

Malice is implied by law from every unlawful and cruel act committed by one person against another, for the law considers that he who does an unlawful and cruel act voluntarily, does it maliciously. Where the killing is shown to have been done with a deadly weapon, that is, with a weapon likely to produce death, it is presumed to have been done maliciously.

Manslaughter is where one person unlawfully kills another without malice. For example, when one in a sudden affray, or fight, in the heat of blood, or in a transport of passion, inflicts the mortal wound without time for reflection or for the passions to cool.

This being a case of circumstantial evidence, it becomes necessary for the court to instruct you respecting the law applicable to evidence of such character.

Such law has been very clearly and correctly stated by this court in other cases, and we can see no reason to depart from the language heretofore approved and used by the court.

Circumstantial or presumptive evidence is receivable in both civil and criminal cases. In criminal matters the necessity of admitting it is indeed much more manifest than in civil matters. Crime usually seeks secrecy, and the possibility of proving the offense charged by direct or positive evidence is much more rare and difficult in criminal cases than in civil cases. Circumstantial

or presumptive evidence is where some facts being proved, another fact follows as a natural conclusion from the facts actually proved, so as readily to gain the assent of the mind that it actually occurred.

It is the inference of a fact from other facts proved, and the fact thus inferred and assented to by the mind is said to be presumed; that is to say, it is taken for granted until the contrary is proved. And this is what is called circumstantial or presumptive evidence, and it is adopted the more readily in proportion to the difficulty of proving the fact by direct evidence and the obvious ease with which it can be disproved, or with which other facts can be proved, which are inconsistent with it, if it never really occurred.

The universal experience of those engaged in the administration of justice shows the absolute necessity of admitting circumstantial evidence, and relying on it, in forming our conclusions in regard to the guilt or innocence of accused persons. But while we say this we also say to you most emphatically, that circumstantial evidence, to warrant a conviction, must be entirely satisfactory, and of such significance, consistency and force, as to produce conviction in the minds of the jury, of the guilt of the accused beyond a reasonable doubt. The great rule on this subject is this: That when the evidence is circumstantial, the jury must be fully satisfied, not only that those circumstances are consistent with the prisoner's having committed the act charged as constituting the crime, but they must also be satisfied that the facts are such as to be inconsistent with any other rational conclusion than that the prisoner was the party. They must be such as to exclude any other hypothesis or conclusion.

Or, to state the rule in a somewhat different way, where the evidence relied upon to prove the guilt of the accused is circumstantial, it is essential, *first*, that such circumstances be proved to the satisfaction of the jury beyond a reasonable doubt; *second* that such circumstances be in all respects consistent with the theory of the guilt of the accused; and, *third*, that such circumstances be inconsistent with any other reasonable theory than the guilt of the accused. In other words, there should not be a conviction upon circumstantial evidence unless such evidence be sufficient to exclude any reasonable inference or conclusion other

than that the accused is guilty of the crime charged. In order to warrant a conviction upon such evidence it is not sufficient of course that the evidence establishes a suspicion, a possibility, or even a mere probability of the guilt of the accused, but it must establish such guilt to a reasonable and moral certainty, and beyond a reasonable doubt.

Where the evidence is convicting the jury should reconcile it if they can, but if they cannot do so, they should accept that part of it which they deem worthy of credit, and reject that which they deem unworthy of credit, having due regard to the intelligence or ignorance, and impartiality or bias of the witnesses, and their opportunity of knowing the facts to which they testified.

In determining the credit to be given to a statement in writing made by the prisoner, the whole of what he said should be considered, but the jury may reject, as not entitled to belief, such parts of it as are contradictory to other parts of it, or in conflict with facts otherwise proved to the satisfaction of the jury. The jury may believe that part of the statement which charges the prisoner, and reject that which is in his favor, if under all the circumstances of the case they find sufficient grounds for so doing. The duty of the jury in respect to the statement of the prisoner, and in respect to his own testimony, and the testimony of other witnesses, is precisely the same. They should believe so much of such statement and testimony as they deem true and worthy of belief, and reject so much of the same as they deem false and unworthy of belief.

Gentlemen of the jury, you have listened very patiently and attentively to the presentation of this case, which has occupied several days, and it will now become your duty to determine from the evidence, applying thereto the law as we have stated it, whether the prisoner is guilty or not guilty. The case is important to the prisoner and also to the people—the state. It should receive from you the most careful and conscientious consideration, and we believe it will.

In conclusion we say, that in every criminal prosecution the defendant is presumed to be innocent until his guilt is proved to the satisfaction of the jury beyond a reasonable doubt. In order

Charge—Verdict.

to convict the prisoner it is incumbent upon the state to prove beyond such a doubt every material element or ingredient of the crime charged. If, after carefully considering and weighing all the evidence, you should entertain a reasonable doubt of the guilt of the prisoner, you should give him the benefit of such doubt, and your verdict should be not guilty.

But proof beyond a reasonable doubt does not mean that the guilt of the accused must be established with the absolute certainty of a mathematical demonstration. Matters of fact are required to be proved to a moral certainty. To require more in dealing with human conduct, and the affairs of life, would be impracticable and therefore unreasonable. It is sufficient that any disputed fact in the case shall be established by that amount of competent and appropriate evidence which will satisfy a fair and unprejudiced mind beyond a reasonable doubt.

Reasonable doubt in the legal sense, therefore, does not mean a vague, speculative or whimsical doubt, nor a mere possible doubt, but a substantial doubt, and such a doubt as intelligent, reasonable and impartial men may honestly entertain after a careful examination, and conscientious consideration, of all the evidence. If after carefully and conscientiously considering all the evidence in the case you believe that the guilt of the prisoner has been established beyond a reasonable doubt, your verdict should be guilty. If you are not satisfied beyond a reasonable doubt of the guilt of the prisoner, your verdict should be not guilty.                                       Verdict, guilty.

### STATEMENT OF REASONS FOR NEW TRIAL.

Upon taking the verdict of the jury, counsel for the prisoner made a motion to the court to set aside the verdict and that a new trial be granted. By leave of the court, he subsequently filed reasons in support of his motion, which were substantially, as follows: That the verdict was against the law and the evidence; that the court erred in admitting in evidence, on behalf of the state, the testimony of the witness Stevenson, in rebuttal, that it had come to the knowledge of the prisoner, since the trial, that two witnesses (naming them) will testify that on Sunday, August

twenty-eighth last, it rained very hard for some time, at Claymont, and the ground there was very muddy; that the chief of police of the city of Wilmington will testify that he visited the home of Mrs. Baldwin, a witness on the part of the state, at Claymont, and that she said to him "she would be unable to recognize the man whom she saw looking in her window the night of the murder of Robert Casey, Jr., and Ann Casey, even if she should see him again;" that the said chief of police will testify that one of the jurors (naming him) stated to him, within a day or two after the trial, "if the defendant had been a man who could have proven a previous good character, he would not have voted for his conviction on the testimony as presented by the state at the trial;" that on account of three witnesses (naming them) having returned to Chester, Pennsylvania, where they live, after having given their testimony, at the trial, on behalf of the prisoner, the latter was unable to contradict the witness Stevenson, who testified that the prisoner was in the neighborhood of Brandywine Springs, on August twentieth last, and had in his possession and displayed a large sum of money, but that he will be able, if granted a new trial, to contradict the witness Stevenson, and prove that he, the prisoner, was during the whole day of August twentieth last in the city of Chester, Pennsylvania; that the coroner of New Castle County neglected and failed to hold an inquest in the cases of the late Robert Casey, Jr., and Ann Casey, deceased, at the instance and request of the Attorney General, and thereby prevented the prisoner from being plainly and fully informed of the nature and cause of the accusation against him, and deprived him from having compulsory process in due time for obtaining witnesses in his favor, contrary to *section* 7, *article* 1, *of the Constitution of the State of Delaware.*

(January 14, 1910.)

PENNEWILL, C. J., delivering the opinion of the court:

The court have listened very attentively to the argument upon this motion, and have reached a conclusion in which we feel very clear; and we therefore can see no reason why the decision should be delayed.

Opinion—Sentence.

We think that in this case the verdict should not be set aside, nor a new trial granted for any reason or ground that has been assigned. We further say, that we are satisfied that the prisoner has had a fair trial, and that everything has been done, by his counsel, in his defense, that any counsel could possibly have done.

The motion for a new trial is refused.

PENNEWILL, C. J.:—Reese Roberts, stand up.

Reese Roberts, you have been indicted by the grand jury, of this county, for the murder of Robert Casey, Jr., in the first degree; and upon that indictment, you have had a fair and impartial trial. Your counsel, with great zeal and fidelity, presented to the court and jury, every fact and argument which in his judgment were applicable for your defense. The jury, nevertheless, rendered a verdict of guilty. Therefore, it becomes the solemn duty of this court to pronounce the sentence of the law upon you for the commission of the heinous crime for which you were indicted. Have you anything to say why the court should not now pronounce the sentence of the law upon you?

The Prisoner:—Yes, sir; I am not guilty of the crime.

PENNEWILL, C. J.:—Is that all you have to say?

The Prisoner:—Yes, sir; I also ask the mercy of the court.

PENNEWILL, C. J.:—The sentence of the law, as considered by the court, is that you, Reese Roberts, be now taken from the bar of this court, to the New Castle County Workhouse, the public prison of this county, the place from which you came, and be there safely and securely kept in custody, until Friday, the fourteenth day of April, 1911, and on that day between the hours of ten o'clock in the morning and three o'clock in the afternoon, you be taken to some convenient place of private execution, within the precincts of the said prison inclosure, and that you be then and there hanged by the neck until you be dead; and may God have mercy upon your soul.

You are now committed to the custody of the Board of Trustees of the New Castle County Workhouse until this sentence is carried into execution.