## Fisher, Appellant, *v.* Sweet & McClain et al.

Argued December 10, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*David L. Ullman,* with him *George Jerko,* for appellant.

*Paul E. Beaver,* for appellees.

OPINION BY KELLER, P. J., January 27, 1944:

In this workmen's compensation case, the appellant sought to establish before the referee and the board, respectively, a common-law marriage between herself and the deceased employee, but failed to do so to their satisfaction. On appeal from the order of the board disallowing compensation for herself and her child, born six months after the employee's death, the court below affirmed the board and entered judgment in favor of the defendant employer. She then appealed to this court. The judgment will be affirmed.

The claimant, Betty Fisher, was fifteen years and nine months old—lacking three months of the 'age of consent'— when the alleged common-law marriage took place.

John McClain, a young man twenty-one years old, was employed by the defendant firm or company in its coal mine. He lived with his grandmother. Betty Fisher, the claimant, testified that he had been "going with" her for about a year, and they had planned to go to Virginia on May 20, 1941 to get married by a preacher. She said that on January 1, 1941, at about 11:00 or 11:30 o'clock in the evening, "he was at our home and we decided that we would marry ourselves, and he asked me if I would be his wife and cherish and to love him unto death, and I said I did; then I asked him if he would take me to be his wife and he said he would, and we married ourselves." She had never been

at a wedding nor heard a marriage ceremony performed, she said. No one else was present at the time and they told no one of the alleged marriage, at least until January 11, when McClain spoke about it to H. A. Dilling, Betty's brother-in-law. They continued to live as before, he with his grandmother, she with her parents. She gave as their reasons for not being married until May 20, 1941, that she wasn't old enough to get married in January (she would not be 16 until April 8, 1941[1]) and that young McClain was then going to a defense school and would not be through until May. At a later session before the referee, when asked by her attorney if there was anything else in addition to his going to the defense school that caused them to marry themselves in January and agree to be married by a preacher later on, she answered: "Well, he wanted to have an intercourse and I said, No, not until after we were married." Under her attorney's questioning, she said that they had retained their plans to be married by a preacher on May 20, 1941 because "we wanted to satisfy our parents, his parents and mine." They had not told his parents or hers of their alleged 'marrying themselves', because they felt they would not be satisfied with 'this marriage' of January 1st, and so they were going to be married by a preacher, as they had planned, in order to satisfy them. The girl first knew that she was pregnant in April, and she testified that when she told John of this he said they would be married on May 20th. He was killed by a fall of coal on May 7th.

The girl also testified that she had spent four or five nights with McClain at the home of her sister, Mrs. Dilling, where they had intercourse together; and that pretty nearly every night after January 1, John came

---

[1] Until she was 16 years old, she could not obtain a marriage license, even with the consent of her parents, unless the judge of the orphans' court, in his discretion, authorized the clerk of the court to issue it. Act of March 24, 1927, P. L. 64, 48 PS §19.

to her home and they stayed downstairs in the living room all night, and two or three nights a week they slept together on the studio couch there.

It was shown by Harry Heaton, who worked in the mine with McClain and also attended the defense school with him, that the defense school did not start until *February 24, 1941,* nearly two months after January 1, and lasted until May 5, 1941; that he and McClain roomed together at the latter's grandmother's from the time the defense school started until McClain was killed; that their workday at the mine started at 6:00 A.M. and lasted until 2:30 P.M.; that the defense school started at 4:15 P.M. and lasted until 12:15 A.M. for five days a week, that is every day but Saturday and Sunday; and that McClain went home with him every night after defense school.

The referee filed his report disallowing compensation, stating that he was unable to find from the evidence that the claimant and the decedent had entered into a valid common-law marriage, and therefore found that the relation between them was illicit and meretricious.

While the referee did not explicitly state that he did not believe the claimant's story, we think it is implied from his discussion in the eighth finding, and from his finding as a fact that "a marriage was intended in the future." See *Baker v. Mitchell,* 143 Pa. Superior Ct. 50, 17 A. 2d 738.

The claimant appealed to the board, which was unwilling to decide the question of fact as to whether there had been a common-law marriage without hearing the testimony of the claimant's sister and brother-in-law, the Dillings, at whose home she said she and McClain had spent some nights together. The board, accordingly, set aside the referee's findings of fact and remanded the case to him for the purpose of taking any additional competent testimony that either party might care to offer bearing on the question of the actual re-

lationship between the claimant and decedent. It is clear from the board's opinion that it viewed the referee's findings in the same light as we do, for it said: "The referee, however, *not being impressed with the testimony of the claimant* (a minor 16 years of age at the time of the hearing) and having no corroborative testimony relative to cohabitation or reputation produced before him has determined that there was merely a meretricious relationship here and not a common-law marriage." (Italics supplied) The board's action was evidently inspired by the feeling that as the legitimacy of a young child was involved every opportunity should be given the claimant to prove her case.

At the rehearing before the referee Dilling testified, as claimant's witness. His wife, the claimant's sister, although present was not called by her and did not testify. Dilling's testimony did not impress the referee favorably. He said: "The testimony of the claimant's brother-in-law, Howard A. Dilling, is such as to make more convincing a meretricious relationship than that of a common-law marriage. We can find nothing in that testimony to support a finding of a marriage." Accordingly, he practically reiterated his prior findings that claimant had failed to establish a common-law marriage between them, but showed rather that a marriage was intended in the future, and that following January 1, 1941 they did not live together and did not hold themselves out to their friends and acquaintances as husband and wife; that decedent continued to live with his grandmother until the date of his death and claimant continued to live with her parents, although the decedent did continue to visit the claimant at her home as he had done *previously to January 1, 1941.* He stated finally that he was unable to find from the evidence that the claimant and decedent had entered into a valid common-law marriage, but on the contrary found that the relation between them was illicit and meretricious,

and therefore held that she was not entitled to compensation as his common-law wife.

The evidence of Mr. Dilling, in our opinion, supports the above statement of the referee.

He testified that on January 11, 1941, ten days after the alleged marriage, McClain and Betty came to his house and "John told me in the evening, I imagine it was around about seven thirty or eight o'clock, that him and Betty had talked it over and *thought they would marry themselves.* And he was telling me about it there, and I told him he had better be married by law in order to have it right, and he said he would a little later, I didn't know just when, and I told him as far as I was concerned *they could call themselves married."* (Italics supplied). See *Murdock's Est.,* 92 Pa. Superior Ct. 275, 285.

Claimant's attorney then assumed, contrary to what had just been testified, that John had said they *had* married themselves, instead of "they thought they *would* marry themselves," and asked him: "Q. Did John McClain tell you when they had married themselves? A. Yes, he said the 1st of January, New Years Eve." On cross-examination he testified: "Q. What brought up the subject of marriage, do you recall? A. He talked about *he would like to get married* and stuff and he said *they had kind of decided to marry themselves first,* and I told him I thought it would be best if he would have some Justice or the law, and he said that he wanted to a little later . . . . . . Q. When they came back the second time didn't you inquire as to whether or not they had been married by the law as you term it? A. Well, I asked him about it a couple of times, and he said he just didn't have the money yet to go and get married; he was figuring on a later date. I told him as far as I was concerned he could go ahead and sleep together. Q. You allowed them to sleep together, yet you felt in your own mind they weren't legally married? A. Yes.

Q. Did you tell your wife about this? A. I told her that night when I went to bed. Q. You weren't satisfied about it? A. I didn't feel it was too good to do that. Q. And you objected? A. I objected. Q. They didn't convince you that they were married? A. No. Q. And so when they came back the second time did you make any objection to your wife? A. Well, I don't think I said much about it after that. Q. You did ask them whether they had gotten married? A. I asked him about it two or three times. Q. And his excuse was that he didn't have the money? A. That's what he still told me, that he didn't have the money. Q. And despite the fact that you weren't satisfied of their marriage you allowed them to stay at your home? A. Yes. Q. And altogether how many times would you say they stayed there over night? A. Oh, I would say about four times between January and his death. Q. When was the last time you saw John McClain before he died? A. It was two weeks before his death, I believe, that they stayed there. Q. And did you talk to him at that time about his marriage? A. Yes, we had. We talked about it and I had talked about loaning him the money at the time to go and get married. Q. You didn't like this arrangement, did you? A. No. Q. And you were even going to assist them financially in order that they could get married? A. I told him I would loan him the money; he said no, he was figuring on the 20th of May, that was his pay day and he was figuring on a good pay. They had coal strike there for a while and he didn't have work, and when he got back to work then he figured on getting married on his own money ......
Q. Did John McClain say anything else to you other than what you have testified about this marriage proposition? A. He told me that Betty was in the family way, that was a couple months after it had happened, and I told him he had better go and get married then.

Q. And what was his answer? A. He said he was going to, that's what he told me."

On appeal by the claimant, the board, after reviewing the claimant's testimony, said: "At the further hearing, the witness whose testimony was material, stated that the parties had agreed to marry in the future and that he had advised the claimant and decedent to marry. We are of opinion that the record fails to establish a common-law marriage: *Baker v. Mitchell,* 143 Pa. Superior Ct. 50, [17 A. 2d 738]. The illegitimate child is also not entitled to compensation: *Smrekar v. J. & L. Steel Corp.,* 137 Pa. Superior Ct. 183, 189, [8 A. 2d 461]. Accordingly, we affirm the Referee's findings of fact, conclusions of law and order of disallowance. The appeal of the claimant is dismissed."

The court below in affirming the order of the board, said: "We have examined the testimony very carefully and fully agree with the Referee that the relationship existing between these two young people was illicit and meretricious."

We agree with that statement.

It is urged upon us in this court that the referee and the board did not say that they disbelieved the claimant's testimony, but rather held that her testimony, even if believed, was not sufficient to support a finding of a valid common-law marriage. We do not so read the findings, conclusions of law and orders.

We think it is clear from the whole record that neither the referee nor the board believed the claimant's testimony of a marriage any more than we would have believed it if we had been the fact-finding body.

The board is the ultimate fact-finding body. Its findings in this case are not capricious or arbitrary. On the contrary, they are in accord with what, in our opinion, is the credible evidence in the case. That being so, it is not within the authority of the court below or

of this court to set them aside and reverse the order which they support.

Judgment affirmed.

While not actually raised or involved in this case, the present record leads us to believe that, in the light of a recent remedial statute, (Act of May 17, 1939, P. L. 148) prior lower court rulings that the acts of assembly providing for the issuance of marriage licenses did not apply to common-law marriages should now be reconsidered.

The first statute on the subject, the Act of June 23, 1885, P. L. 146, had for its object the keeping of true and correct records of all marriages within the Commonwealth. Notwithstanding the fact that the Act specifically declared that "no person, within this Commonwealth, shall be *joined in marriage*,[2] until a license shall be obtained for that purpose," and provided not only for issuance of a certificate by a minister, justice of the peace or alderman that the applicants had been united in marriage by him but also for a certificate evidencing that *the parties had united themselves in marriage*—a form appropriate for a common-law marriage[3] no less than for a wedding of members of the Society of Friends—it was held in a number of lower court decisions that a license was not necessary for a common-law marriage.[4] The various amendments to that act[5] were likewise concerned with the keeping of true and correct records.

---

[2] The parties to a valid common-law marriage are as effectually *joined in marriage* as they would be by a ceremonial marriage performed by a minister.

[3] See *Hudek v. United Eng. & Foundry Co.*, 152 Pa. Superior Ct. 493, 33, A. 2d 41.

[4] *Biesecker's Est.*, 7 Dist. 70, 4 Lack. L. N. 4; *Gerson v. Oil City Trust Co.*, 28 Dist. 853, 47 Pa. C. C. 476; *Shouey v. Shouey*, 16 D. & C. 693, 696; *Abbott's Petition*, 27 D. & C. 205; *Com. v. Betts*, 25 Del. 149.

[5] May 23, 1887, P. L. 170; May 1, 1893, P. L. 27; June 18, 1895,

But the Act of May 17, 1939, P. L. 148, was enacted for a wholly different purpose. It is a public health measure, and should be construed so as to effectuate that purpose, if at all possible.

It is entitled, "Regulating the issuance of marriage licenses; prohibiting the issuance thereof to persons infected with syphilis in certain stages; requiring each applicant to produce certain evidence of freedom from such disease; imposing duties upon the Department of Health and the clerk of the orphans' court of the various counties, and imposing penalties."

It forbids, inter alia, the issuance of any license to marry until there shall be in the possession of the clerk of the orphans' court a statement or statements signed by a duly licensed physician of this Commonwealth that each applicant, within thirty days of the issuance of the marriage license had submitted to an examination to determine the existence or non-existence of syphilis, (which examination shall include a standard serological test or tests for syphilis), and that in the opinion of the examining physician, the applicant is not infected with syphilis, or if so infected, is not in a stage of that disease which is likely to become communicable. The physician's statement must be accompanied by a statement from the person in charge of the laboratory making the test or from some other person authorized to make such statement, setting forth the name of the test, the date it was made, the name and address of the physician to whom a report was sent and the exact name and address of the person whose blood was tested, but not setting forth the result of the test.

It is clearly a public health measure designed to

P. L. 202; March 27, 1903, P. L. 80; May 6, 1909, P. L. 446; May 28, 1915, P. L. 636. See, however, Act of July 24, 1913, P. L. 1013, and its amendment of May 7, 1935, P. L. 152; and the Act of March 24, 1927, P. L. 64, establishing the minimum marriageable age of 16 years.

assist in the eradication of syphilis, and to prevent the communication of syphilis by a diseased spouse to the other, who was free from it, and to prevent the birth of children with syphilitic weaknesses or deformities.

Certainly the legislature never intended that such an important hygienic statute could be circumvented by the simple device of the parties entering into an informal marriage contract in verba de praesenti—i.e., a common-law marriage—without first obtaining a license, after being examined by a physician, and securing from him a statement that they were free of syphilis, etc.; or by entering into such a marriage after a marriage license, pursuant to the statute, had been refused them.

We have no thought of attacking the validity of common-law marriages. That is a matter for the legislature to handle. It is within our province, however, to hold that a valid common-law marriage cannot *hereafter* be entered into in this Commonwealth without first complying with the Act of 1939 and securing a marriage license pursuant to its provisions. And this holding will go a long way towards eliminating the fraud and perjury so often occurring with respect to common-law marriages; for it would establish a present intention on the part of the applicants to be *married,* and not merely an intent to have sexual relations.

Coming down to the facts of this case, while there is no testimony that either of these young people had syphilis, the fact remains that McClain, in having sexual intercourse with this young girl in January 1941, was guilty of 'statutory rape', even though she consented to the act, unless they were married when it took place, and that at the time, under the law, she was not competent to marry McClain in this State, even with her parents' consent, unless the judge of the orphans' court, at his discretion, directed the clerk of the court to issue the license, which direction was not secured or even asked for here.

A long step in the way of avoiding such occurrences, and consequent attempts to validate them by loose swearing, will be taken, if it is held that, hereafter, marriage licenses must be obtained, pursuant to the existing marriage license statutes, including the Act of 1939, before any valid marriage, ceremonial or common-law, can be entered into. We think this is an appropriate occasion so to rule, and we now do so.

Judges KENWORTHEY and RENO concur in the judgment.